## Court of Appeals.

### January, 1900.

### PEOPLE v. BARONE.

1. HOMICIDE—DELIBERATION.

Conflicting evidence as to deliberation and premeditation on a trial for murder, held sufficient to warrant the submission of the case to the jury and to sustain their verdict, objected to as against the weight of evidence.

2. EVIDENCE—CONCLUSION.

An expert for the prosecution, on a trial for murder, who, in reply to a competent question, stated an incompetent conclusion, may be cross-examined with reference thereto. The defendant should not be obliged to resort to a motion to strike out, or to a request for an instruction to disregard.

3. CRIMINAL LAW—CHARGE.

In commenting upon the testimony of a witness as to an alleged confession by defendant, it is reversible error for the trial court on a trial for murder, to state that some one must have told the witness how the killing occurred, as he could not have divined it, where it is not impos sible that the witness invented the story, adapting it to the facts gener ally known to himself.

4. SAME—TECHNICAL ERRORS.

The court of appeals is required to give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties.

APPEAL from a judgment rendered at a criminal trial term, for the county of Erie, upon a verdict convicting the defendant of the crime of murder in the first degree, and sentencing him to punishment by death.

Eugene M. Bartlett, for appellant.

Frederick Haller and Thomas Penney, for respondent.

VANN, J.—On the 11th of July, 1898, the defendant Guiseppe Antonio Barone, was jointly indicted with Rosina Barone, his wife, and one Vincenzo Muscarello for the murder of Phillippo Forestino on the 20th of June, 1898, at the city of Buffalo. The indictment contains two counts, by the first of which the defendants were charged with inflicting certain mortal wounds upon said Forestino by means of a knife "willfully, feloniously and from a deliberate and premeditated design to effect" his death. The second count charged them with the same act committed "with force and arms  *  *  *  willfully, feloniously and of their malice aforethought." The accused persons demanded separate trials and on the 3d of October, 1898, the indictment was moved against Guiseppe Antonio Barone, henceforth called the defendant. More than sixty witnesses were called for the People, and nearly as many for the defendant, including himself and his wife, and on the 22nd of October, 1898, the jury rendered a verdict of murder in the first degree. A motion for a new trial was made, argued and denied, and judgment of death was pronounced against the defendant on the 2nd of November, 1898. From that judgment this appeal was taken.

The theory of the prosecution was that the defendant, on learning that his wife had been guilty of adultery with Forestino, with deliberation and premeditation took his life, in pursuance of a conspiracy formed between himself and the other defendants. The theory of the defendant was that, while he killed Forestino in the manner charged in the indictment, the act was done without deliberation or premeditation, upon the impulse of the moment and in self-defense. The issue of primary importance, therefore, was whether the homicide was committed with deliberation and premeditation.

Rosina Barone is the wife of the defendant and an aunt of the wife of his co-defendant, Vincenzo Muscarello. The defendant was born in Sicily in 1861, was married there in 1886,

and in 1891 he came to America and located in the city of Buffalo. His wife, formerly of good repute, came here later, with their three children. Prior to the homicide his reputation, as given by his employers and others, was that of an honest, industrious and peaceable citizen. At the time of his arrest he had worked continuously for one employer a period of six years and three months.

The deceased was a small man, five feet two inches in height, about thirty years of age, of less physical strength than the defendant and had been in this country over five years before his death. He had resided for three years at No. 42 Fly street, Buffalo, a house occupied by many Italian families, in which the defendant and his wife also resided for twenty months. During this period Forestino became criminally intimate with Mrs. Barone, but the defendant did not know it at the time, although it was generally accepted as a fact by the acquaintances of all concerned. In the fall of 1897, he contracted a venereal disease from his wife, which she had caught from Forestino, and thereupon he charged her with infidelity, but she stated that she caught it from a man who overcame her by violence. She did not make this statement until it became necessary to present some excuse to her husband. Whether he believed it is open to doubt for he promptly sent her and their children back to Italy, sold his household effects at auction and went to boarding with his brother. This was in October, 1897, and on the 22nd of March, 1898, she returned to her husband, who was apparently expecting her, as he had secured and furnished rooms at No. 11 Olga place, where they went to living together. This house was in the Polish section of the city and quite remote from the Fly street house, which was in the Italian quarter. During the absence of his wife in Italy, according to his statement, the defendant received two or three letters from her asking him to take her back and stating that the children were dying of hunger, but he answered the first only, refusing to take her back because she had disgraced him. The letters were not produced and he swore they had been destroyed. While she was gone he asked Forestino to fix a clock for him,

and the relations of the two men were apparently friendly until the time of the homicide.   When she returned, as he says, she asked him to forgive her, stating that she had been taken advantage of through no fault of herself, and he did forgive her on account of the children.   He insists that up to the time of the homicide he had no suspicion that Forestino had been intimate with her.   The reason assigned by him for taking rooms at Olga place was that he did not wish to live again among the Italians, who knew of his disgrace.

Mrs. Barone occasionally returned to the Fly street house for the purpose, as claimed by the People, of seeing Forestino, who still resided there, but, as claimed by the defense, in order to see her old acquaintances.   She was there a week before the homicide and saw Forestino, and three days later she saw him there again and had a talk with him, during which, as evidence was given tending to show, she invited him to visit her, stating that the air was good and he had better come out there.   The defense claims the invitation was general, to all her old acquaintances, and not to Forestino in particular, and this view has some support in the evidence.   The testimony relating to what was said upon the subject, even as given by each witness, was somewhat contradictory,  but it appears satisfactorily that Mrs. Barone furnished Forestino a piece of paper or card and that he made a memorandum and put it in a little book in his pocket. After his death a memorandum was found in a pocket book on his body in the following form :  " Clinton st. Olga pl. N. 11." " Clinton st." doubtless refers to one of two street car lines which could be taken to reach Olga place, but the cars on the William street line ran a little nearer and more frequently than those on Clinton street.   Mrs. Barone says that she used to take the William street line to go to Olga place, and that she did not know where Clinton street was or the number of her house at Olga place.   She could not read or write and kept the card to show when she asked a policeman what car to take in order to go home.   She denied that she invited Forestino to her house, but admitted laying this card down on the table for Mrs. Mazzia, in his presence, and that he took it up and wrote the address on a piece of paper.   She saw him again, for the third time during

the same week, only two days before the homicide, as herein-after stated.

On Saturday evening, the second day before the homicide, the defendant borrowed a wheelbarrow and moved a lot of old railroad ties, which he had procured for fuel two days before, about three blocks to Olga place and unloaded them in front of the house, where they remained until Monday morning. The ties were heavy and it took him about two hours to move them.

The same evening Muscarello arranged with one Salvatore Battaglia for the loan of a horse and wagon, saying that he wanted to use them the next morning at five or six o'clock to take a cross to the cemetery, where he had recently buried a child. It was finally agreed that Muscarello should have the horse and wagon at between eight and nine o'clock the following morning, which was Sunday, June 19th, the day before the homicide, but he did not go for them, giving as an excuse that it looked as if it was going to rain. It did rain during the the night and was cloudy in the morning. About ten or eleven o'clock he asked Salvatore if he could have the horse and wagon on some day during the following week, but his re-quest was refused, as Salvatore said he needed the horse for himself on week days in his business of huckstering. Musca-rello's statement as to the purpose for which he wanted the horse and wagon was corroborated by several witnesses. He told various persons that the reason he did not take the cross on Sunday was that he felt unwell, having drank too much Saturday night. His wife swore that when he came home Sunday morning he was intoxicated, ate no breakfast, went out at ten, complained of not feeling well and did not return until late. Other witnesses swore to substantially the same facts. He went to work at the usual hour on Monday morning, work-ed almost all day, and ceased earlier than usual at the sugges-tion of his employer. He had lost a child on the 13th of June, and, shortly before he arranged for the horse and wagon, had purchased a stone for its grave, and had hired a marblecutter to cut an inscription upon it, so that it could be taken to the ceme-tery on the Sunday in question.

On Sunday morning, at about ten o'clock, the defendant, with his wife and three children, aged respectively nine, six and two years, left their home at Olga place and later in the day were seen upon the street in the vicinity of the Fly street house. Mrs. Barone went to that house at one o'clock, remained four or five hours, and during this time saw Forestino. While she was there the defendant went to Salvatore Battaglia and tried to purchase a horse and wagon, saying that he was tired of working and wanted to go into the huckstering business. Salvatore offered to sell, but the defendant was unwilling to pay the price asked. Salvatore swore to this, but the defendant denied it. The defendant waited in the vicinity for several hours while his wife was in the Fly street house, and when she left he promptly met her. They went to the place where they had left the children, took them to the house of a relative, and left the older two until after the homicide the next morning. They then returned to No. 11 Olga place with their youngest child, reaching home at about eight o'clock in the evening. The defendant says he supposed his wife was looking for new rooms near their old home on Fly street while he was waiting for her, but new rooms had already been engaged.

Sunday evening Forestino, the deceased, agreed to do some work for a man on Monday morning, but he did not do it, leaving word as he left home at about eight o'clock that he would do it later in the day. Shortly after, he met an acquaintance, who asked him to put a faucet into a wine barrel, but he said he could not do it then as he had a little job elsewhere. About half-past eight he asked a policeman, on duty in the vicinity of Olga place, to be directed to No. 11, and at the same time showed him the address in a memorandum book. The officer did so, and Forestino went in that direction. He soon reached the house, which was occupied by five families, Mrs. Martin living on the first floor front, and the defendant and his family on the second floor front. As Forestino approached the house Mrs. Martin saw him look up toward the windows of the defendant and smile, but she did not observe that Mrs. Barone was in sight. He entered the house, went upstairs, walked into the defendant's rooms, and was never seen outside

alive. Shortly before this the defendant and his wife had been carrying water from a faucet in the hall into their room, and putting it in a boiler on the stove, in which there was a fire. At about the same time Mrs. Barone, in accordance with her usual custom, asked a little girl, the child of a neighbor, to stay with her baby while she was gone to market, but when the child went up for that purpose, about two minutes before Forestino arrived, she was sent down again and told that she was not needed. Just before this Mrs. Barone went to the grocery for some beer, and People claim she saw Forestino coming, but she denies it.

From five to fifteen minutes after Forestino went upstairs and entered the defendant's room, something was heard to fall heavily on the floor as if a human body had fallen, and immediately after a human voice was heard crying out, followed by the cry of a child, which ceased at once. Mrs. Martin, who was in a room directly under those occupied by the defendant, and the landlady, who was directly at the rear of his rooms, on hearing the noise, ran to his door and head a loud groaning inside. They heard no noise of any struggle in the room before the heavy fall and the cries. They tried the door, but found it fastened. They called to the defendant and his wife to open the door, but there was no response and the door was not opened. All the noise in the defendant's room suddenly ceased, except there was a faint thumping or kicking, as if feet were working on the floor. After the lapse of a little time, footsteps and sounds of scrubbing the floor were heard in the room, and soon Mrs. Barone and the defendant with his sleeves, rolled up almost to the shoulders, were seen washing out some clothes in a sink in the hallway in front of his door, and after that wet clothes were observed hanging on his doorknob. Not long after, Mrs. Barone came down stairs into the yard, walked back and forth a number of times, and then left, taking the youngest child with her, the other children having been away all the time. She stayed away all day, returning about eleven o'clock at night, bringing the three children and leaving them with a neighbor.

The defendant left the house between eleven and twelve in

the forenoon, went to a store on Seneca street, purchased a large trunk, and about a quarter past twelve carried it home. This trunk was in all respects like the one in which the body of Forestino was subsequently found. In the afternoon the defendant was seen at the same sink washing out a tub. Part of the floor in the defendant's room looked as if it had been recently scrubbed, the walls were freshly washed in places, and red spots were found in different parts of the floor, which on scientific examination, proved to be blood. The same afternoon the defendant, without help, dragged a number of the railroad ties, which he had left in the street, into the yard and piled them up.

Toward night the defendant requested Muscarello to see Salvatore Battaglia and get a horse and wagon. Muscarello saw Salvatore and asked him for a horse and wagon to use that evening, saying that he wanted to take a cross to the cemetery and also to move a stove and a machine. Salvator went with him to the barn, where the wagon was, and Muscarello, on noticing that it was not a covered wagon, asked for one with a top, but Salvatore told him that he hadn't any. Muscarello asked, "Why, I saw your brother have one the other day and I was pleased with the appearance of it." Salvatore answered, "That belongs to Manzella." Muscarello said he didn't care for the wagon, but at once went to Manzella and tried to borrow a wagon from him without a horse, offering to deposit $10 to pay for any damage that might be done to it. This was a covered wagon, but Manzella refused to let him have it. He then returned with a brother of Salvatore, named Orazzio, to Salvatore's barn and tried again to get a wagon from him. Orazzio soon went away and Muscarello told Salvatore that he wanted to confide in him, and that if he would come with him there was a hundred dollars to be divided between them, adding that a trunk was to be moved from one house to another. When asked what was in the trunk, after some hesitation, he answered, "a dead one." Salvatore said all right, let us get the horse and wagon, but I want my brother to go with me, for I don't wish to go alone. Muscarello then left, stating that he would be back in ten minutes, but he did not return for half an hour, having in the meantime gone to the house of one Olenzio to

borrow a covered wagon, saying it was to remove a machine and stove. On procuring this wagon Salvatore's horse was hitched to it and Muscarello, Orazzio and Salvatore got in and drove away together. On reaching a certain point Muscarello whistled, when the defendant appeared and got into the wagon with them. He asked Muscarello what he brought these men for, and Muscarello said he could not get the wagon without. Salvatore drove, the defendant telling him where to go, and they reached No. 11 Olga place soon after eleven. The defendant got out, went into the house and came back with some iron wrapped in a rag and put it in the wagon. Salvatore insisted on being paid the $50 agreed upon, before proceeding further, and when a roll of bills was handed to him by Muscarello he struck a match and counted it. Salvatore and defendant then went into the house and brought a trunk down from the front room. Mrs. Barone being present, but her three children were at a neighbor's downstairs. The trunk was heavy and the two men, in bringing it down, slid it along the stairs, then carried it out and put it in the wagon. At about this time the defendant told his wife to go up town, and she and Muscarello at once left the house, taking the children with them. She did not return again until the next morning, having spent the night at No. 306 Terrace, where, as evidence was given tending to show, Muscarello had procured other apartments for the defendant a few days before. This was in the Italian section and near the Fly street house. Salvatore, Orazzio and the defendant got into the wagon and drove off, the defendant directing as to the course, and on the way there was some talk about throwing the trunk into the canal. When they reached a point where there were no houses, near a dock on the Blackwell canal, about three miles from Olga place, they stopped, the trunk and the pieces of iron were taken out, carried a short distance and put down. The defendant took some cord from his pocket, tied the iron to the handles of the trunk and threw it into the canal. Shortly afterwards the three men started to drive home and during part of the way back Orazzio laid down in the bottom of the wagon asleep, while the defendant and Salvatore sat upon the seat.

While they were thus driving, as Salvatore testified, he asked the defendant to tell him the truth as to what was in the trunk, and he refused at first, but after some urging said, "Don't tell any one; I had a misfortune and killed a man and put him in the trunk." Salvatore said: "If you have done this you have been a butcher to do so barbarous a murder." For a short time both were silent, but soon the defendant said: "Tell me, Salvatore, if your wife was in bed and asleep and there comes another man and goes to sleep with your wife and gives her a sickness or a disease, what would you do?" Salvatore replied: If this was the motive for the homicide Barone had done wrong; that he would take the wife out, give her a couple of kicks and turn her out; " that there were other.women," and then asked if that was what Muscarello wanted the wagon for on Sunday, "that you were to kill the man," and the defendant said it was for this that he wanted to get the wagon. He also said his wife had written him if he would send her the money to come from Italy she would write and tell him who had given her the disease, adding, "and for this I kill him;" that he sent his wife to seek Forestino on Sunday and had sent her more than once for that purpose; that he was hidden in the house in another room, and when Forestino come in his wife shut the door, and while they were talking together he came out and stabbed him; that he went in front of him, and holding the knife behind his back, said, "Hello, what are you doing here?" and stabbed him, while his wife held his arms or hands behind him; that after he had fallen his wife held his legs to keep him from kicking and that he himself got on him and held him by the neck to keep him from yelling; that he had cut the body up with a knife and a saw and put it in the trunk with the revolver that Forestino had; that he had cut him with hot water and his wife wanted to cook or boil him, and that the reason why Muscarello went for the wagon on Saturday and Sunday was to dispose of Forestino's body; that he expected him there on Sunday but he did not come.

The next morning the trunk, partly submerged, was found floating in the canal. It contained the dismembered body of Forestino, a child's dress which belonged to one of the defend-

ant's children, a loaded revolver, which fitted a case afterwards found in Forestino's room, a long-bladed bread knife, a saw, a purse with a little money in it, and a cheap memorandum or pocket book containing the address of the Olga street house. The legs had been severed from the body at the knee with a knife, and the head, at the neck, with a knife and saw. The principal wound on the body, apparently inflicted with a long-bladed knife, was on the right side of the anterior wall of the chest, an inch and a half below the collar bone, penetrating through the right lung to the wind pipe behind. The track of the wound was six or seven inches long and its general course was nearly parallel to the collar bone, the inner end being near the middle of the body. It was sufficient to cause death at once. Near this wound was a small puncture, half an inch long, and about that in depth, which did not enter the cavity of the chest. On the right shoulder in front there was a bluish spot, apparently a bruise, which, in the opinion of the physicians, was inflicted before death. There was also a scratch on the right side of the chest, which, according to their judgment, might have been made either before or after death. At numerous points about the face, especially on the left side, the skin was discolored, and its superficial layer more or less torn off. The body was fully dressed with coat, pants, vest and shirt, but there was no knife cut through the shirt, which was ripped from the neck down some distance. There was no sign of disease about the body.

The next day the defendant went to work at the usual hour, and his wife purchased a duplicate of said trunk at the same place where the defendant had procured the one in which the body was found. The same day she removed their furniture from No. 11 Olga place, which was ten minutes' walk from where defendant was working, to No. 306 Terrace, which was about an hour's walk from where he was working. On Tuesday afternoon, about four o'clock, she went where the defendant was at work and had some talk with him, and he then quit work saying that his child had died, which was untrue. When arrested the same night at No. 306 Terrace, three vests were found in his room, each of which had a pocket on the inside

suitable for carrying a knife with a blade upwards of seven inches in length. No other vest was found there. He says he had the pocket made to carry his money in and it appeared that he used to carry several hundred dollars on his person somewhere, but when he was arrested it was found in his coat.

The defendant and his wife were sworn, and while they varied in their statements, their story in substance was that Forestino entered the room without knocking, and the defendant, who was sitting at the window, asked him to sit down. Forestino said he did not come to sit down, and Mrs. Barone, who had been sitting at the table, said, why do you come here to disturb me again. The defendant says it then occurred to him for the first time that Forestino was the man who seduced his wife, and he said, "You miserable man, you are the one who disturbed me in my house before," whereupon Forestino replied, "Yes, you cuckold," and drew a revolver. The defendant sprang for him, snatched the revolver from his hand and "took it onto the bed, or carried it over to the bed" of his child. Mrs. Barone grabbed Forestino by the arms and said, "For pity's sake go away," but he refused, saying, "No, before I will go from here I want to kill you and your husband." The defendant also tried to make Forestino go out, but he escaped from them both, rushed to the bed, got the revolver, and as he turned and was about to shoot, the defendant caught up the bread knife from the table and stabbed him, seizing him by the collar as he did so. The defendant testified that as Forestino turned with the revolver in his right hand, he, the defendant, faced him with the bread knife in his right hand, yet he stabbed him in the right side. He explained this by saying that he caught him by the collar and pulled him around, and that he heard something tear as he did so.

To continue the story of the defendant and his wife, Forestino, as the knife was pulled out, made an outcry, fell forward on his face and blood spurted on the wall and covered the floor. The defendant threw away the knife and fell with Forestino and the kettle of boiling water fell on Forestino's

head at the same time. "All the blood that he had flew out," and he lived but two or three minutes. Within fifteen minutes the floor was cleaned and Mrs. Barone took the child and went away. The defendant bought the trunk, hired Salvatore Battaglia and his horse, returned to the house and tried to put the body in the trunk without cutting it up, but could not do it. He locked the door, went out and sat in the shade for half an hour, procured some pieces of iron and returned to the house. With the same knife he cut off the legs from the body at the knee, cut the neck to the bone, then used the saw, and the head fell into a tub. He packed the different parts in the trunk, put with them the articles already mentioned and locked it.

The rest of his story does not differ materially from that told by Salvatore Battaglia, except that he denied making any confession on the way back from the canal. He admitted that he made many untrue statements to the district attorney and the police upon his arrest, and among others, that he wrote to his wife in Italy that he would send for her if she would tell him who gave her the disease, but that she did not tell him until she came back. On the trial the defendant and his wife both testified that she never told him.

The great mass of testimony, to much of which we can make no allusion, given mostly by Italian witnesses, is difficult to analyze or understand. After carefully studying it, we think the evidence to establish a conspiracy to lure Forestino to the defendant's rooms and kill him, which bore directly on the subject of deliberation and premeditation, presented a question of fact for the jury. The testimony of Salvatore Battaglia is the most important for the people in this connection, but when testifying before the grand jury he omitted all reference to the confession which, at the trial, he swore the defendant had made to him while they were riding back in the wagon after disposing of the trunk. He says he omitted it because he was afraid of punishment. There are discrepancies also between the testimony given by Salvatore before the grand jury and on the trial, and he doubtless testified in the hope that he would save himself from punishment on

account of his aid in concealing the body, for before the trial he had been indicted as accessory after the fact. His brother, though in the same wagon, did not hear the alleged confession, but he was in the back part all the time and asleep part of the time.

Confessions are to be received with caution, owing to the danger of mistake, but the danger of error in this respect in the case before us is less than the danger of error from Salvatore's possible untruthfulness. If he told the truth, the defendant admitted that he sent his wife to get Forestino to go to the house, laid in wait for him and killed him when he came. This statement is corroborated by the fact that Forestino did go to the house, where he had never been before, and went to the defendant's rooms at a time when he was ordinarily away at work. The defendant admits substantially all that Salvatore swore to except the confession and the attempt of defendant to buy a horse of him on Sunday afternoon. He also admits telling the district attorney that he wrote his wife he would send for her if she would tell him who gave her the disease, but insisted that it was not true. The children were away when Forestino came which was unusual, although it had happened before, and the neighbor's child was sent away, which had never happened before, so far as the evidence discloses. Mrs. Barone had furnished Forestino with her address and had an opportunity, although it does not appear that she availed herself of it, to invite him to her house at the time he was killed. Mrs. Barone and Forestino, according to the testimony of Mrs. Mazzia, were together at her rooms in the Fly street house from one to six o'clock on the Sunday afternoon before the homicide, and during part of the time she was working while they were talking together, though not very near one another, and she did not hear what they said. She heard Mrs. Barone on Thursday say to Forestino, " You come," and he answered, " I do not know the house," when she furnished the card as already stated. She either handed the card to Forestino or placed it so that " he got it, and he made an entry on paper or in his book of the address."

The house at Olga place is in a thickly-settled locality. It is

a small, frame, two-story dwelling occupied by twenty-five persons, a majority of whom were children. While there were no shades or blinds to the windows of the apartments occupied by defendant, there were half curtains of lace, but one could see through them, and there was some evidence tending to show that the windows were up a short time before the homicide. According to the recollection of Mrs. Martin, who lived directly beneath, Forestino was in defendant's room fifteen minutes before she heard the noise of the fall, the human voice and the cry of the child, followed by silence. She testified that after Forestino went upstairs, and before she heard the fall, she finished putting a patch on the trousers of her little boy, sewed on one button and was starting to put on another. The landlady, who was in the room at the rear of defendant's, could not state the length of this interval, but said " may be " it was five or ten minutes. Their account contradicts the story told by the defendant and his wife, who say that the struggle commenced almost immediately after Forestino entered the room. It is insisted by the people that the story of the defendant and his wife is untrue. They argue that his account of his sudden conclusion that Forestino had seduced his wife is unreasonable, and that it is improbable that Forestino drew his revolver and said he wanted to kill both defendant and his wife before he left, although no offer of violence had then been made. The people also ask why the defendant did not work that day as usual, for he had lost but one day in two months. He says the reason was that his back was lame, " as it was sprained by carrying the ties," yet he carried more heavy ties on the day of the homicide, and his regular work for six years was carrying sacks of earth weighing from two to three hundred pounds. They further ask why the defendant, after getting the revolver from Forestino, parted with its possession, and why, if he acted in self-defense, he proceeded to promptly remove all signs of the homicide, to conceal the body and to remove to another house previously rented? They insist that the object of Mrs. Barone in getting Forestino to come to the house, so that her husband could kill him, was to carry out her agreement with the defendant when he took her back, to betray her seducer. They further insist that Sal-

vatore's story is true, because it was a circumstantial account, full of details that he could not have invented, was corroborated in many important respects, and was evidence which did not excuse but told against himself.

On the other hand, the defendant insists that satisfactory evidence of preparation for the crime is wanting; that the preponderance of evidence shows that the wagon was not engaged by Muscarello on account of the murder, but for a lawful purpose; that he would not have asked to take it at half-past five Sunday morning for the purpose alleged, because that would have been too early; that the character of Salvatore Battaglia, who had been in prison in Italy, is bad, his evidence unreliable, and that it would be unsafe to found a conviction of murder in the first degree upon it; that it is improbable that the defendant would confess to Battaglia and make no effort to excuse or defend his conduct; that his story is extraordinary and incredible; that defendant had a revolver, which was found in his trunk when he was arrested, and if he had intended beforehand to kill Forestino, it is probable that he would have had it ready to use; that the use of the bread knife is inconsistent with preparation, for it was in common use in the family, yet no other knife was found; that it is improbable that the defendant would have planned to commit the crime in broad daylight in a house occupied by many persons and situated in a thickly-settled locality; that the preparation made for washing and for the morning and midday meal, as well as the trip of Mrs. Barone to the store for beer just before Forestino came, are inconsistent with a deliberate and premeditated act; that it is improbable that Mrs. Barone would have enticed Forestino to her house in order to murder him, because she had no motive for doing so; that the defendant's character was good, and that what he did after the homicide showed a want of preparation beforehand.

It must be admitted that the theory that the wagon was engaged by Muscarello for a lawful purpose has strong support, although he may have resorted to it as a pretext to cover up his real purpose. If Salvatore is to be believed when he said that the defendant tried to buy a horse and wagon of him on Sunday afternoon, it points strongly toward preparation. So,

if his story is true, the probability is strong that Mrs. Barone, at the request of her husband, invited Forestino to come to her house on the morning of the homicide. The story is corroborated to some extent by the admission of the defendant to the district attorney, and by the evidence that she had the opportunity to invite him, and he came, although he had never been there before. It may have been a coincidence that he came when the defendant was at home, although at an hour when he would usually be at work, and an accident that he smiled when he looked up at the window. The fact that the older children had been left at the house of a relative over night may or may not have been in preparation for the crime. Their presence in those limited apartments would have been an impediment to murder if one was designed, yet they had been left away before, but sending the neighbor's child from the room shortly before the homicide had never happened before. The case is involved in some obscurity, and, unfortunately, we encounter the same difficulty in most cases where the evidence is given by Italian witnesses through the aid of an interpreter.

We will not prolong our review of the facts, for enough has been said to show that there was sufficient evidence of deliberation and premeditation to send the case to the jury, and that their verdict should not be set aside as against the weight of evidence. They saw Salvatore Battaglia and the other witnesses when they were upon the stand, looked into their faces, observed their manner when testifying, and were prepared to decide who told the truth and who did not. We do not have the advantage of seeing and hearing the witnesses, and must, ordinarily and almost of necessity, leave all questions of credibility undisturbed, as they were settled by the jury, unless we have a well-grounded belief that justice requires a new trial.

Upon examining the exceptions, the most serious that we find is the refusal of the court to allow the defendant to ask Dr. Park on cross-examination, whether the marks of violence upon the body of Forestino indicated a struggle.

Dr. Park was called by the people and testified that he made an autopsy on the body of the deceased. After describing the wounds, he was asked by the district attorney what conclusions

he arrived at as to the cause of death, and, reading from a memorandum, he stated his conclusions upon that subject, and then asked, "Do you want about the circumstances?" and the district attorney replied, "Yes, sir." After saying several things not now important, he stated as a part of his answer to the question calling for the circumstances: "This wound may have been inflicted while the victim was either in an upright or prone position. There are not the ordinary evidences of a struggle having taken place." This was not objected to, and no motion was made to strike it out. After stating one or two other things the direct examination of the doctor closed and the court adjourned until the next day. Seven days later he was cross-examined for the first time, and, after again describing the external appearance of the body and the wounds, was asked by the defendant's counsel, "if there were a bruise upon the breast and two wounds and this rupture of the cuticle, it would indicate, would it not, or be some indication of a struggle?" The district attorney objected upon the ground that that question was for the jury, and the objection was sustained, the defendant taking an exception. The attention of the court was not called to what the witness had sworn to on his direct examination in relation to the subject.

It was of vital importance to the defendant to show that a struggle took place before the homicide, as it had a direct bearing upon the question of deliberation and premeditation. Mrs. Martin and the landlady had sworn that they heard no noise of a struggle during the interval which elapsed between the time when Forestino entered the room and the heavy fall upon the floor. The defendant and his wife, who testified after the ruling in question, said that there was a struggle, and stated the circumstances in great detail. The two wounds, the bruise, the discoloration and the torn clothing would be some evidence to on ordinary observer that there might have been a struggle. The question whether there was a struggle or not was in the case, and as it was determined one way or the other by the jury it was bound to have an important effect upon their verdict. Upon the record, after this ruling had been made, the statement of Dr. Park that the ordinary evidences of a struggle was want-

ing, stood unmodified. It was an important statement from an important witness, who stood high in the community for his skill and integrity, and we must assume that it had weight with the jury. The fact that it may have been an inference on the part of the learned doctor would not be apt to lessen its persuasive force with the jury. It went far toward practically taking the question as to a struggle out of the case. We shall not pause to consider whether it was responsive or not, further than to remark that it was called forth by a very general question, but shall treat it as evidence which came out during the examination of the district attorney and remained on the record as evidence for the consideration of the jury, without comment or action on the part of the court or of counsel on either side. Assuming that it was a conclusion of the witness, and not a fact, the question presented is whether a vital inference, drawn by an expert of high standing, and sworn to without objection as a part of his evidence during his examination by the people, may remain in the case as evidence, and yet the defendant be denied the right of cross-examining in relation thereto.

There was no opportunity to object, for the question which brought out the doctor's statement was competent, and a motion to strike out would have been denied according to the usual rule. Platner v. Platner, 78 N. Y. 90; Pontius v. People, 82 N. Y. 339, 347; Holmes v. Moffat, 120 N. Y. 159. An instruction to disregard would have been a doubtful remedy, as the jury could not forget the inference drawn from actual observation of the body by a man of experience and learning, and it made the way easy for them to draw the same inference.

We think, under the circumstances of this case, the defendant was not obliged to resort to a motion to strike out or to a request to instruct, and that he could cross-examine, if he preferred, as the district attorney did not, himself, move to strike the evidence out. The prosecution could not set the witness going by a general question, let his answer stand, and prevent cross-examination by claiming it was not responsive. The ruling fairly comes within the principle announced in the late case of People v. Buchanan, 145 N. Y. 1, 24, where it was held that a witness may be re-examined, by the party calling

him, upon all topics on which he has been cross-examined, and this, although the cross-examination was as to facts not admissible in evidence. In deciding that case Judge Gray said: "I understand the rule to be that a witness may be re-examined by the party calling him upon all topics on which he has been cross-examined, for the purpose of explaining any new facts which came out; but the re-examination must be confined to the subject matter of the cross-examination. He may be questioned to show the meaning of his expressions, or of his motive in using them. 1 Starkie on Evid. *208; Clark v. Vorce, 15 Wend. 193, 196. Even if the cross-examination has been as to facts not admissible in evidence the rule seems to be that the witness may be re-examined as to evidence so given. 1 Greenl. on Evid. § 468; 2 Phillips on Evid. *973; Blewett v. Tregonning, 3 Ad. & El. 554." In Blewett v. Tregonning, *supra*, Lord Denman, referring to a statement thrown in voluntarily by a witness on cross-examination by the defendant, said: "It did, however, come in and the plaintiff was, therefore, entitled to pursue it unless the defendant got it struck out, and that was not done." Both of these cases related to the re-examination of a witness, but the rule as to cross-examination is even more liberal. We have examined the anthorities cited in behalf of the people, but they do not justify the ruling in question. While we are required to give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties, we think the refusal of the court to permit Doctor Park to answer the question put to him on cross-examination affected a substantial right of the defendant and requires a reversal of the judgment.

One exception to the charge requires discussion. Referring to the testimony of Salvatore Battaglia, the trial judge said: "In examining this man's testimony we must bear in mind that somebody told Battaglia how this killing occurred; someone has told him how he was stabbed in the room because he could not divine it; he did not guess it out, and he, himself, tells you that it was through the voluntary confession of the defendant, himself, in substantially this language." The judge thereupon stated the substance of Battaglia's testimony in relation to the

alleged confession of the defendant, and proceeded as follows: "That is the testimony of Salvatore Battaglia. This testimony is criticised by the defendant. It is claimed by the defense that he is interested in throwing the responsibility for this crime upon the shoulders of defendant and screening himself from it. Now, whatever there is of this claim, it is for you to determine. Salvatore Battaglia is not charged with murder in this case; he is chargeable, if with anything, with being an accessory after the fact, in helping to hide and screen a crime, knowing it must have been committed, if he is guilty of anything. And if this man has told the truth as to how the killing of this defendant took place, and the circumstances which led up to it and brought it about, it is a strong circumstance to be taken in connection with the other proof in the case bearing upon his guilt."

The counsel for the defendant excepted to that portion of the charge "that some one has told Salvatore Battaglia how the killing of Forestino occurred, and that he did not guess it out." The trial judge thereupon remarked, "Well, I make this statement in connection with the claim of the district attorney; he claims that somebody has told him these facts."

It is to be observed that the remarks of the court, challenged by the exception, were neither taken back nor modified. The judge simply said that he made the statement in connection with the claim of the district attorney to the same effect. It was in substance a repetition of the statement with the addition that the district attorney made a similar claim.

The learned judge, in the hurry of an extemporaneous address, inadvertently fell into error when he said that somebody told Battaglia how the killing occurred, and that somebody told him how he was stabbed in the room, because he could not "divine it" or "guess it out." He asserted this as a fact, not as a claim, and when it was followed by the statement that Battaglia, himself, said the defendant had told him, it might well have been regarded by the jury as an intimation that the court believed Battaglia's evidence. The statement of the court excluded the possibility that Battaglia had manufactured the confession out of whole cloth, as the defendant claimed. The defendant either made a confession to Battaglia or he did not.

If he did, it was a vital fact. If he did not, the story of Battaglia was the invention of some one, presumptively of himself. If it is an invention, it is not important who invented it, for Battaglia knew that the defendant had not told it to him. The jury had the right to find it was a fabrication, yet the court told them in substance that Battaglia could not have made it up. More than three months had elapsed between the homicide and the trial. The evidence shows that the body of the deceased was exposed at the morgue and that the general facts of the case, including what was found in the trunk, were known to the public. Battaglia could readily infer that Forestino was killed in defendant's room, and that the defendant did the killing, for he aided in taking the body away and accepted $50 from the defendant for his services. Why, then, must some one have told him " how the killing occurred," or " how he was stabbed in that room ? " Why could he not have invented the story, adapting it to the facts generally known to the public, as well as to those specially known to himself? We do not wish to intimate that he did, or did not, but it is very clear that he might have done so, and that the court usurped the functions of the jury when it told them that Battaglia " could not divine it " and " did not guess it out." We think this was reversible error and that it was not corrected by the rest of the charge, which we have quoted so far as material to the point under consideration. It is true that the credibility of Battaglia was impliedly, though not with any caution on account of his conflicting statements, submitted to the jury, but if they accepted the statement of the court, they could not find he invented the story, for they had been told that he could not have divined it or guessed it. The assertion, or instruction, stood unretracted and unmodified.

There are other exceptions in the case, but we do not think it necessary to discuss them. For the reasons already given we reverse the judgment and order a new trial.

All concur (GRAY, J., on ground that the ruling on cross-examination of Dr. Park was erroneous), except HAIGHT, J., not voting. Judgment reversed, etc.